[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 10, 2000
THOMAS K. KAHN
CLERK

No. 97-2540

D.C. Docket Nos. 85-07009-CV & 85-07010-CV

GREGORY SOLOMON, PATRICIA BECKWITH, RALEIGH
BRINSON, on behalf of themselves and all others similarly situated,

                                                    Plaintiffs-Appellants,

versus

LIBERTY COUNTY COMMISSIONERS, LIBERTY COUNTY
SCHOOL BOARD, L. B. ARNOLD, Commissioner, WILLAIRD
REDDICK, Commissioner, JOHN T. SANDERS, Commissioner,
DONNIE COXWELL, Commissioner, et al.,

                                                    Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Florida

**(August 10, 2000)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This case involves challenges under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1994) (as amended), to the at-large method of electing the county commission and the school board of Liberty County, Florida. We hold that the district court properly denied relief and therefore affirm.

## I.

The facts and procedural history of this case have been developed extensively in two previous panel opinions, Solomon v. Liberty County, Florida, 865 F.2d 1566, 1568-69 (11th Cir. 1988), vacated, 873 F.2d 248 (11th Cir. 1989) (Solomon I); Solomon v. Liberty County Comm'rs, 166 F.3d 1135, 1138-40 (11th Cir.), vacated, 206 F.3d 1054 (11th Cir. 1999) (Solomon III), and one decision from the en banc court, Solomon v. Liberty County, Florida, 899 F.2d 1012 (11th Cir. 1990) (en banc) (Solomon II). We restate only those parts of the record necessary to dispose of the issues before us.

Both the county commission and the school board in Liberty County consist of five members who serve staggered four-year terms. The county is divided into five

residential districts; candidates for the commission and the school board run from the district in which they live. In both the party primary and general elections, the entire county electorate votes for one candidate from each district. A candidate must receive a majority of the countywide vote to be selected as his or her political party's nominee in the general election. If no candidate receives a majority of the vote in the party primary, a run-off primary election is held. In the general election, candidates must obtain a plurality of the countywide vote to win election. Because most candidates in Liberty County are Democrats, however, voters usually decide races during the party primary elections.

In 1985, four African-American residents of Liberty County challenged the at-large method of electing county commissioners and school board members under section 2 of the Voting Rights Act. They brought suit in the United States District Court for the Northern District of Florida against the Liberty County Commission, the Liberty County School Board, and the individual members of those bodies in their official capacities.[1] Plaintiffs claimed that the electoral systems deny African-Americans a fair opportunity to participate in the political process and to elect candidates of their choice, and therefore sought an injunctive order dividing the

---

[1] Cases against the county commission and the school board were originally brought separately. The district court consolidated the cases for trial. In the case brought against the school board, plaintiffs also alleged that the electoral system violated the Fourteenth and Fifteenth Amendments to the United States Constitution. The constitutional claims are not before us on appeal.

county into five single-member districts.[2] One of these single-member districts would have an African-American majority.

The district court denied relief and a panel of this court vacated the decision and remanded the case for further proceedings. The case was reheard en banc. In a per curiam opinion joined by all members of the en banc court, we held that "as a matter of law . . . [plaintiffs] have satisfied the three Gingles factors [(compactness/numerousness, minority cohesion or bloc voting, and majority bloc voting)]." Solomon II, 899 F.2d at 1013. However, we were "divided in our interpretation of Gingles and section 2 of the Voting Rights Act." Id. One part of the court expressed the view that "proof of the three Gingles factors is both necessary and, in this case, sufficient for a section 2 vote dilution claim," id. at 1017 (Kravitch, J., specially concurring), and another part of the court took the position that "the totality-of-the-circumstances test must mean that the defendant can rebut the plaintiff's claim – even after the plaintiff has offered proof of the three Gingles factors," id. at 1035 (Tjoflat, C.J., specially concurring) (emphasis in original). The court, therefore, vacated and remanded without "specifically direct[ing] the district court on how to proceed on remand." Id. at 1013. Rather, we "instruct[ed] the district court to

---

[2] Each district would elect one member to the county commission and one member to the school board.

4

proceed in accordance with Gingles, giving due consideration to the views expressed in Chief Judge Tjoflat's and Judge Kravitch's specially concurring opinions." Id.

On remand, the district court held that because the three Gingles factors were established as a matter of law, its inquiry was limited to determining whether other circumstantial evidence weighed in favor or against an ultimate finding of vote dilution under section 2. Looking to the nine "Senate factors" used by courts to determine whether vote dilution exists under the totality of the circumstances,[3] the court found, first, that "[n]otwithstanding the remaining vestiges of official discrimination in Liberty County, there is no evidence that the ability of blacks to participate in the political process has been hindered by that discrimination." Solomon v. Liberty County, Florida, 957 F. Supp. 1522, 1559 (N.D. Fla. 1997). The court explained:

> Black candidates have been invited to speak at all of the Democratic party political rallies. Two blacks . . . are members of the Executive Committee of the Liberty County Democratic Party. But perhaps most telling of all is that every witness who spoke on this point concluded that there are no blocks to the political process arising from past or present acts of official discrimination.

Id. (citations omitted).

---

[3] The nine "Senate factors" are discussed, infra., in part II.A.

Second, the court found that "there is a high degree of racially polarized voting in Liberty County." Id. at 1560.

Third, the court found that "the majority vote requirement, and to a much lesser extent the size of Liberty County, can enhance the possibility of discrimination against black voters in Liberty County." Id. at 1561.

Fourth, the court found that the "the county has a very informal, unofficial candidate slating process," but that "[t]he greater weight of evidence indicates that blacks have not been excluded from Liberty County's informal slating process." Id. at 1561-62. This is because one African-American candidate, Earl Jennings, was "in a lineup in his 1980 campaign for the school board," and "appeared on a successful candidate slate in the 1990 county commission election." Id. at 1562. Also, the court found that another African-American candidate, Gregory Solomon, "testified that he was promised support from [a white, politically powerful family] and other family factions – and if he had actually received the support promised to him, he would have been elected." Id. at 1562 n.95.[4]

Fifth, the court found that "the evidence does not indicate that black political participation has been hindered by socioeconomic disparities." Id. at 1563. This is

_____

[4] Both Gregory Solomon and Earl Jennings were originally plaintiffs in this case. Earl Jennings was dismissed as a plaintiff and substituted as a defendant after he was elected to the Liberty County Commission in 1990.

because "black registration percentage has exceeded white registration percentage," "[t]here is . . . no evidence that any black has been discouraged from running for office because of the existence of a qualifying fee," "[there have been a high] number of black candidacies since 1986," and "the local Democratic Executive Committee has sponsored well-attended rallies to which all candidates were invited and which the black candidates attended." Id. at 1564.

Sixth, the court found that "there is no evidence that racial appeals have been made in any recent elections (within the last twenty-plus years) in Liberty County." Id. at 1565.

Seventh, the court found that "the more recent history of elections in Liberty County shows consistent electoral success by the black candidate of choice for public office," as evidenced by the fact that "Earl Jennings was elected at-large to a county commission seat from the first residential district, and has twice been reelected to office." Id. at 1565-66. In making this finding, the court recognized that it "must closely scrutinize the election of a minority following the onset of section 2 litigation," but that "there is no evidence of any special circumstances in this case which would require the Court to disregard Mr. Jennings' electoral success." Id. at 1566.

Eighth, the court found that "with few exceptions, the Liberty County School Board and County Commission have been responsive to the needs of the black community." Id. at 1567.

Ninth, the court found that the policy underlying the voting procedures applicable to the school board and county commission is not tenuous. As for the county commission, the court noted that "[p]laintiffs correctly conceded that there was no racial motivation behind the 1900 amendment to the Florida Constitution of 1885, which provided for at-large election of county commissioners." Id. at 1567. As for the school board, "[t]here is little question that the Florida legislature's 1947 legislation allowing counties to adopt at-large districts for the election of school boards . . . was designed to dilute the voting power of the black community." Id. However,

> notwithstanding the Legislature's racial animus, Liberty County was not similarly motivated when it changed its school board elections from single-member district elections to at-large elections. [An expert witness and a Liberty County resident] testified that Liberty County made the change in approximately 1953. The adoption of at-large school board elections resulted from a citizen's reform movement in the county to abolish the existing ward-type political system.

Id. at 1567-68 (footnotes omitted). To dispel any argument that the policy underlying the continued maintenance of the at-large election processes for the school board and county commission is tenuous, the court stated that

8

[o]n September 4, 1990, Liberty County conducted a county-wide referenda election . . . to determine whether single-member district elections should be adopted for county commission and school board elections. The voters in Liberty County rejected the county commission referendum by a vote of 376 (28.46 percent) for and 945 (71.54 percent) against single-member district elections . . . . [An expert] determined that 59.1 percent of the black voters voted against single-member districts for county commission elections, and 60.0 percent voted against single-member districts for school board elections . . . . Obviously, the fact black and white voters in Liberty County voted overwhelmingly against single-member districts, tends to undercut any suggestion that the continued policy of maintaining at-large elections for county commission and school board elections is somehow discriminatory or otherwise tenuous.

Id. at 1568 (emphasis in original).

Finally, the court found that "Liberty County is not driven by racial animus in the electoral process," and that even though African-Americans have not achieved proportional representation on the Liberty County School Board, with the election of Earl Jennings in 1990, 1992, and 1996, they have achieved proportional representation on the county commission. Id. at 1570.[5] After recognizing that "it will be only the

---

[5] Using 1990 census data, the court determined that African-Americans constituted 25.03 percent of the voting age population in Liberty County. "[W]ith blacks comprising twenty percent of the county commission's membership, blacks have clearly achieved proportional representation on the county commission." Solomon, 957 F. Supp. at 1570.

In discussing the relevancy of whether African-Americans had achieved proportional representation in Liberty County, the district court cited to Johnson v. De Grandy, 512 U.S. 997, 1018-20, 114 S. Ct. 2647, 2661-62, 129 L. Ed. 2d 775 (1994). De Grandy dealt with a section 2 challenge to already existing single-member districts, in which the plaintiffs claimed that the state's failure to maximize the number of majority-minority voting districts diluted the minority vote. The Court held that "no violation of § 2 can be found here, where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." Id. at

very unusual case in which plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of section 2," id. (citation and internal quotation marks omitted), the court weighed all the evidence and concluded under the totality of the circumstances that "[p]laintiffs have failed to establish section 2 liability as to both [the county commission and the school board electoral] systems," id.

---

1000, 114 S. Ct. at 2651. De Grandy thus addressed the relevance of "proportionality," not "proportional representation." The Court wrote that

> "[p]roportionality" as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2, which provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). This proviso speaks to the success of minority candidates, as distinct from the political or electoral power of minority voters. And the proviso also confirms what is otherwise clear from the text of the statute, namely, that the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.

Id. at 1014 n.11, 114 S. Ct. 2658 n.11 (citation omitted). The degree to which minority candidates have achieved proportional representation may be relevant under the totality of the circumstances in a given case. See 42 U.S.C. § 1973(b) ("The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered."). But it is important to keep the concepts of "proportionality" and "proportional representation" distinct. Section 2 explicitly disclaims any "right to have members of a protected class elected in numbers equal to their proportion in the population," id., but it just as clearly supports the idea that minority groups are entitled to a proportionally equal share of electoral power. See id. ("A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice."); De Grandy, 512 U.S. at 1014 n.11, 114 S. Ct. at 2658 n.11 (finding that "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success").

10

A panel of this court reversed. Solomon III, 166 F.3d at 1138. The panel held that the district court had clearly erred in finding that (1) African-Americans have not been excluded from Liberty County's informal slating process, (2) African-Americans have enjoyed consistent electoral success in Liberty County in recent years, and (3) the policy underlying the voting procedures applicable to the school board and county commission is not tenuous.

The panel criticized the district court's reliance on the election of Earl Jennings to establish that African-Americans have not been excluded from the informal slating process, and have enjoyed sustained electoral success. Because Jennings was not elected to the county commission until after the commencement of the litigation in this case, the panel would have accorded his electoral success little probative value. See Solomon III, 166 F.3d at 1143-46. The panel also found fault with the district court's reading of the historical record with regard to the tenuousness of the electoral system applicable to school board elections; and in response to the district court's reliance on the 1990 referendum indicating that a majority of African-Americans did not support a change to single-member districts, the panel held that "[w]hether the protected class supports the challenged system . . . is irrelevant in determining whether the system is based upon a discriminatory policy." Id. at 1150.

11

After reweighing the evidence with the district court's purported errors in mind, the panel held that "both the Liberty County Commission and the Liberty County School Board violated section 2 through their at-large election system." Id. One member of the panel dissented, arguing that "[h]ow much weight to assign to Jennings' sustained electoral success is within the discretion of the district court," Id. at 1151 (Black, J., dissenting), and also taking issue with the majority's reading of the historical record as it relates to the tenuousness underlying the school board electoral system. Id. at 1152. The dissent further criticized the majority for "duplicat[ing] the role of the district court and thereby overstep[ping] the bounds of its duty under Rule 52(a)." Id. (citation and internal quotation marks omitted).

The case was reheard en banc and we now affirm the district court's judgment.

## II.

### A.

Section 2 of the Voting Rights Act of 1965 (as amended) provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set fort in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes

leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

To prevail on a claim of vote dilution under section 2, plaintiffs must, at a minimum, establish the three now-familiar Gingles factors: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) that the minority group is "politically cohesive;" and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate. Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S. Ct. 2752, 2766-67; 92 L. Ed. 2d 25 (1986). Proof of these three factors does not end the inquiry, however. In Johnson v. De Grandy, the Supreme Court made clear that

> if Gingles so clearly identified the three as generally necessary to prove a § 2 claim, it just as clearly declined to hold them sufficient in combination, either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution.

512 U.S. 997, 1011, 114 S. Ct. 2647, 2657, 129 L. Ed. 2d 775 (1994).[6] This is because it is entirely possible that bloc voting (as defined by Gingles) could exist, but that such bloc voting would not result in a diminution of minority opportunity to participate in the political process and elect representatives of the minority group's choice. Other circumstances may indicate that both the degree and nature of the bloc voting weigh against an ultimate finding of minority exclusion from the political process. The degree of racial polarization may be not be sufficiently intense, for example; or what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates. "[T]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." Nipper v. Smith, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc) (Tjoflat, C.J., plurality opinion).

> To aid courts in investigating a plaintiff's section 2 claims,
>
> the Gingles court identified other factors that may, in "the totality of the circumstances," support a claim of racial vote dilution. Derived from the Senate Report accompanying the 1982 amendment to section 2, those factors include:

---

[6] De Grandy thus answered the question that this court could not resolve in Solomon II.

14

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that may be probative of vote dilution in some cases are:

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Id. at 1511 (citations omitted).[7]

---

[7] This list is plainly not exhaustive.

Courts evaluating vote dilution claims . . . must consider all relevant evidence; "[n]o single statistic provides courts with a short-cut to determine whether a set of [electoral structures] unlawfully dilutes minority strength." Johnson v. De Grandy,

B.

Because the section 2 inquiry "is particularly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms," the Supreme Court has made clear that "the clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution." Gingles, 478 U.S. at 79, 106 S. Ct. at 2781 (internal citations and quotation marks omitted). Under Federal Rule of Civil Procedure 52(a), "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses."

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would
>
> [512 U.S. 997, 1020-21,] 114 S. Ct. 2647, 2661-62, 129 L. Ed. 2d 775 (1994). Because the court must conduct a "searching practical evaluation of the 'past and present reality' " of the challenged electoral system in operation, Gingles, 478 U.S. at 45, 106 S. Ct. at 2764 (quoting S. Rep. No. 417, at 30, reprinted in 1982 U.S.C.C.A.N. at 177, 208), the types of evidence that would be relevant under this standard plainly defy categorization. Instead, a court gradually draws together a picture of the challenged electoral scheme and the political process in which it operates by accumulating pieces of circumstantial evidence . . . . A court should not exclude certain types of relevant evidence . . . from its examination if doing so would leave an incomplete view of the circumstantial evidence picture. A piece of evidence is irrelevant only if, after the receipt of that evidence, the existence of a fact appears no more or less probable than it did before that evidence was offered. That is, an item of circumstantial evidence is irrelevant only if it does not allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted.

Nipper, 39 F.3d at 1527 (footnotes omitted).

16

have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985) (citations and internal quotation marks omitted); see also City of Carrollton Branch of the NAACP v. Stallings, 829 F.2d 1547, 1562 (11th Cir. 1987) ("Although we have difficulty with the district court's findings, we cannot say that they are clearly erroneous as a matter of law.").

The clearly erroneous standard extends to an appellate court's review of a district court's finding that different pieces of evidence carry different probative values in the overall section 2 investigation. The findings made within the framework of the three Gingles preconditions, and the nine nonexhaustive "Senate factors," will be more or less probative depending upon the facts of the case. A court may find the fact that a minority group has achieved proportional electoral power to be very important, or of little importance, depending on other circumstances that shed light on how the finding of proportionality is linked to the ultimate question of whether vote

17

dilution exists. See De Grandy, 512 U.S. at 1020-21, 114 S. Ct. at 2661-62. In examining a jurisdiction's electoral history, a court may assign more probative value to elections that include minority candidates, than elections with only white candidates, see Johnson v. Hamrick, 196 F.3d 1216, 1221-22 (11th Cir. 1999); it may consider endogenous elections more important than exogenous elections, see id. at 1222; Askew v. City of Rome, 127 F.3d 1355, 1381 n.13 (11th Cir. 1997); or it may conclude that recent elections are more probative than those which occurred long before the litigation began, see Meek v. Metropolitan Dade County, Florida, 985 F.2d 1471, 1483 (11th Cir. 1993). A district court may find that the subsequent electoral success of a minority candidate who was first appointed to his or her position is a strong indicator that the minority group is not being excluded from the political process, see Askew, 127 F.3d at 1384 n.18, or may dismiss the candidate's electoral success because he or she was first appointed, see United States v. Marengo County Comm'n, 731 F.2d 1546, 1572 (11th Cir. 1984). Most important in the instant case, a district court may (but is not required to) discount the electoral success of a minority candidate who was elected during the pendency of section 2 litigation against the state or subdivision in which he or she was elected. See Gingles, 478 U.S. at 76, 106 S. Ct. at 2779. All of the district court's findings regarding the probative value assigned to each piece of evidence are reviewed for clear error. See id. at 76, 106 S. Ct. at 2779-

18

80; Hamrick, 196 F.3d at 1221-22; Solomon III, 166 F.3d at 1151 (Black, J., dissenting).

"Rule 52(a) does not inhibit an appellate court's power to correct errors of law." Gingles, 478 U.S. at 79, 106 S. Ct. at 2781 (citation and internal quotation marks omitted). Also,

> [w]e have strictly adhered to the Fed. R. Civ. P. 52(a) requirement of a definite record in voting rights cases. As we have explained:
> > Because the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, we have strictly adhered to the rule 52(a) requirements in voting dilution cases and have required district courts to explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning.

Hamrick, 196 F.3d at 1223 (quoting Cross v. Baxter, 604 F.2d 875, 879) (5th Cir. 1979) (citations omitted)).[8] Where the district court's understanding of the law is correct, however, and the record indicates that the court "engaged in a searching and meaningful evaluation of all the relevant evidence," and there is "ample evidence in the record to support the court's conclusion[s]," our review is at an end. Southern

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

19

Christian Leadership Conference v. Sessions, 56 F.3d 1281, 1293 (11th Cir. 1995) (en banc).

III.

A.

1.

Plaintiffs' principal contention is that the district court erred in assigning the probative weight that it did to the electoral success of Earl Jennings, an African-American who, as noted supra, was elected to the Liberty County Commission in 1990, and reelected in 1992 and 1996. The district court relied upon this evidence in concluding that African-Americans had not been excluded from the unofficial candidate slating process in Liberty County ("Senate factor" 4), and that minority-preferred candidates had enjoyed sustained electoral success in recent years ("Senate factor" 7). The court recognized that it "must closely scrutinize the election of a minority following the onset of section 2 litigation," but found that "there is no evidence of any special circumstances in this case which would require the Court to disregard Mr. Jennings' electoral success." Solomon, 957 F. Supp. at 1566. Plaintiffs argue that since Jennings was elected during the pendency of this litigation, the probative value of his election should be discounted as a matter of law.

Neither this court nor the Supreme Court has ever held that a district court <u>must</u> discount the probative value of a minority candidate's electoral success because of the timing of the election. Such a procrustian rule would be in complete contradiction to the section 2 "totality of the circumstances" inquiry, which requires "a searching practical evaluation of the past and present reality," and is dependent upon "the trial court's particular familiarity with the indigenous political reality." <u>Gingles</u>, 478 U.S. at 79, 106 S. Ct. at 2781 (internal quotation marks omitted). In this area of the law, almost any "inflexible rule would run counter to the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of the circumstances.'" <u>De Grandy</u>, 512 U.S. at 1018, 114 S. Ct. at 2660; <u>see also</u> <u>Nipper</u>, 39 F.3d at 1527 ("[A]n item of circumstantial evidence is irrelevant only if it does not allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted.").

In <u>Gingles</u>, the Supreme Court stated that

the District Court <u>could</u> appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to appellees' claim. In particular, as the Senate Report makes clear, the court <u>could</u> properly notice the fact that black electoral success increased markedly in the 1982 election – an election that occurred after the instant lawsuit had been filed – and <u>could</u> properly consider to what extent the pendency of this very litigation [<u>might</u> have] worked a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting.

21

Gingles, 478 U.S. at 76, 106 S. Ct. at 2779 (internal citations and quotation marks omitted) (emphasis added) (bracketed material in original). There is certainly nothing mandatory in this language; indeed, the Court's direction is more permissive than compulsory, providing that district courts "could" notice "to what extent" the pendency of section 2 litigation "might" have influenced an election in which a minority candidate was successful. Id. Also, in Gingles the Supreme Court affirmed a district court's finding that the election of some African-American candidates was not dispositive of the section 2 claim (because those candidates were elected during the pendency of the litigation); and, most important, the Court did so under the clearly erroneous standard. Id. at 76, 106 S. Ct. at 2779-80. In the instant case, plaintiffs ask us to reverse the district court by finding error in the court's conclusion that the timing of Jennings' election does not impair the probative value of his electoral success. Whereas the Supreme Court's decision in Gingles was motivated, at least in part, by deference to the district court (under the clearly erroneous standard), plaintiffs in the instant case ask us to reject the district court's conclusions, and discount Jennings' electoral success based on our own, independent review of the record.

We decline to usurp the district court's role and act as an independent trier of fact. In the instant case, there is "ample evidence in the record," Sessions, 56 F.3d at 1293, to support the court's conclusion that the probative value of Jennings' electoral

22

success is not tainted merely because he was elected during the pendency of the litigation in this case. First, the district court found that

> Mr. Jennings was, overall, the black candidate of choice. In 1991, blacks comprised 46.09 percent of the registered voters in residential district 1. In the 1990 election, Mr. Jennings received 75.52 percent of the votes cast in district 1 in the first primary, and 76.81 percent of the votes cast in district 1 in the general election. In the 1992 election, Mr. Jennings received 55.84 percent of the votes cast in district 1 in the first primary (a figure less conclusive of black support), and 72.04 percent of the votes cast in district 1 in the second primary. In the 1996 election, black support in the first primary was apparently divided between the three black candidates (Mr. Jennings received 24.06 percent of the vote in . . . district 1, compared to 52.83 percent for Stafford Stanley Dawson and 12.26 percent for Helen Hall), but was squarely behind Mr. Jennings in the second primary when he garnered 73.02 percent of the votes cast in district 1.

Solomon, 957 F. Supp. at 1562 n.97 (citations omitted). "Whether a given minority candidate who has long enjoyed electoral success is the preferred representative requires appraisal of local facts within the ken of the district court and best left to it." Meek v. Metropolitan Dade County, 908 F.2d 1540, 1548 (11th Cir. 1990). Plaintiffs make much of the fact that the district court appears to have confused residential district 1 with voting precinct 1. Liberty County is composed of five residential districts, each of which is accorded a seat on the school board and the county commission. There are eight voting precincts, however, which simply refer to the eight physical polling locations. Residential district 1 is comprised of voting precincts 1 and 2.

23

It is true, as the district court found at the beginning of the cited language, that "[i]n 1991, blacks comprised 46.09 percent of the registered voters in residential district 1." Solomon, 957 F. Supp. at 1562 n.97. At that point, however, the district court recounted election returns from only voting precinct 1 (while mistakenly indicating that the returns were from residential district 1). Thus, the corrected language should read:

> In the 1990 election, Mr. Jennings received 75.52 percent of the votes cast in [voting precinct] 1 in the first primary, and 76.81 percent of the votes cast in [voting precinct] 1 in the general election. In the 1992 election, Mr. Jennings received 55.84 percent of the votes cast in [voting precinct] 1 in the first primary (a figure less conclusive of black support), and 72.04 percent of the votes cast in [voting precinct] 1 in the second primary. In the 1996 election black support in the first primary was apparently divided between the three black candidates (Mr. Jennings received 24.06 percent of the vote in . . . [voting precinct] 1, compared to 52.83 percent for Stafford Stanley Dawson and 12.26 percent for Helen Hall), but was squarely behind Mr. Jennings in the second primary when he garnered 73.02 percent of the votes cast in [voting precinct] 1.

Id.

Noticing this error, however, only weakens plaintiffs' case. Whereas only 46.09 percent of the residents in residential district 1 are African-American, 67.78 percent of the residents in voting precinct 1 are African-American. Thus, there is a much stronger correlation between the presence of African-American voters and

increased support for Jennings than the district court supposed.[9] We can hardly find clear error where the district court's conclusion is supported by evidence even more persuasive than that relied upon by the court.[10]

Regarding minority candidates' access to Liberty County's informal slating process ("Senate factor" 4), the court found that

> Jennings had been in a lineup in his 1980 campaign for the school board, and that this particular lineup had failed to achieve its goal of defeating the incumbent . . . . At the 1991 retrial, there was no credible evidence which contradicted [an expert witness's] testimony that Earl Jennings appeared on a successful candidate slate in the 1990 county commission election.

---

[9] The dissent in Solomon III also noted this fact. See Solomon III, 166 F.3d at 1151 n.2 (Black, J., dissenting). The dissent used residency numbers from the 1980 census, indicating that voting precinct 1 was 58.05 percent African-American. The 1990 census figures indicate that this percentage has increased to 67.78 percent.

[10] Before 1990, Jennings was a candidate in three other elections. On September 9, 1980, he ran in the Democratic party primary for a seat on the school board, and made it to the runoff election on October 7, 1980. Also, on September 4, 1984, Jennings again ran in the school board primary. Although there is some doubt that Jennings was the African-American candidate of choice in the 1980 elections, there is no dispute that Jennings received 78.2 percent of the black vote in his 1984 primary bid. See Solomon II, 899 F.2d at 1019 n.8 (Kravitch, J., specially concurring).

<u>Solomon</u>, 957 F. Supp. at 1562 (internal citations omitted).[11]  The testimony the court

relied upon in reaching its conclusion was credible and virtually uncontradicted.[12]  We

_____

[11] As discussed <u>supra</u>, the court also noted that
> Plaintiff Solomon . . . testified that he was promised support by [a white, politically powerful family] and other family factions – and if he had actually received the support promised to him, he would have been elected . . . .  This testimony seems to indicate that Plaintiff Solomon may have been initially included on a particular candidate slate, only to be a victim of last minute "double crossing," with family members changing their minds when they actually cast their ballots.

<u>Solomon</u>, 957 F. Supp. at 1562 n.95.

[12] As for the 1980 elections, Dr. Charles Billings, a Professor of Political Science at Florida State University, testified in 1986 as follows:
> I did not find that black candidates were routinely kept off of any slate that was organized in the county.  I was told in one of the interviews of the case of a campaign worker who was described as rough and redneck.  If I recall his name, it was Arthur Story, who was a political activist who upon hearing the outcome of the elections, said that he had won all of his candidates except for Mr. Jennings, suggesting to me that Mr. Jennings was a part of a political organization, if you will, put together in this election to attempt to get a group of candidates elected to help each other.

The plaintiff, Gregory Solomon, testified that Jennings may have been included in a candidate slate in 1980, but qualified his answer by speculating that "Mr. Jennings was put into the race [by whites] to beat the incumbent."  Because it is unclear whether Jennings was the African-American candidate of choice in the 1980 election, the district court found that "the slating of Earl Jennings in the 1980 election is not enough by itself to permit that the candidate slating process in Liberty County is open to blacks."  <u>Solomon</u>, 957 F. Supp. at 1562 n.96 (internal quotation marks omitted).

Instead, the district court principally relied on Jennings' participation in the slating process in the 1990s to establish that "an inference can be created that the candidate slating process in Liberty County is open to blacks."  <u>Id.</u> at 1562 n.97 (internal quotation marks omitted).  With regard to Jennings' elections in the 1990s, Dr. Billings testified on remand in 1996 that
> Jennings ran a very personal campaign, in which he went to all the meetings and shook hands and asked for votes – a very personal kind of campaign.
>
> . . . .
>
> [T]he current state of the electoral system or electoral practices corroborated what I thought about before [in 1986], and that is, is that the many factors – that is, the ability of the minority to be successfully engaged . . ., to be engaged in the electoral process, including being slated, having assistance in arranging meetings and going to meetings, and also to have ads, for example, placed in the paper where their names appeared with other candidates of [the] party – that was corroborated.
>
> In other words, the kind of openness or the kind of progress that I thought would be made evidently was done; that Jennings was able to appear on the slate, full

therefore hold that the district court did not clearly err in finding that "blacks have not been excluded from Liberty County's informal slating process." Id. at 1562.

We also hold that the district court did not clearly err in finding that "the more recent history of elections in Liberty County shows consistent electoral success by the black candidate of choice for public office." Id. at 1566 ("Senate factor" 7). It is undisputed that Jennings won a seat on the Liberty County Commission in 1990, and then retained his seat in 1992 and 1996. Plaintiffs ask us to join them in speculating that powerful white interests manipulated the electoral process in Liberty County in order to assure Jennings' success, so as to preempt a finding of section 2 liability by this court. This we decline to do. The main problem with plaintiffs' argument is that they have offered no evidence to support their white-manipulation theory, other than that which might flow from a fertile imagination. "[O]nce the defendants produce evidence of Jennings' repeated success, it is the plaintiffs who shoulder the burden of controverting such success." Solomon III, 166 F.3d at 1152 (Black, J., dissenting); see Gingles, 478 U.S. at 77, 106 S. Ct. at 2780 (finding that district court erred in "ignoring the sustained success [of] black voters" in electing candidates of choice,

page ad in the weekly paper. He went to several meetings that were arranged by the Democratic party, and he was also able to arrange for introductions to groups that he perhaps didn't know.

where the plaintiffs "failed utterly . . . to offer any explanation for the success of black candidates") (emphasis in original). As the Fifth Circuit has held:

> The Gingles Court's comment regarding circumstances that may explain a single minority candidate's victory cannot be transformed into a legal standard which requires the court to force each and every victory of several minority candidates to fit within a prescribed special circumstance. Every victory cannot be explained away as a fortuitous event . . . . [Gingles does] not compel the district court . . . to automatically pigeonhole the . . . minority victories into the prescribed special circumstances. If the victories could be explained with the special circumstances, the district court was free to do so; however, because the special circumstances did not fit, the district court was not required to force it.

Rollins v. Fort Bend Indep. Sch. Dist., 89 F.3d 1205, 1213-14 (5th Cir. 1996) (emphasis in original). Plaintiffs' argument is akin to the "active conspiracy among the white electorate to allow the black community a token representative" urged on this court in Askew, 127 F.3d at 1385. Here, as in that case, "[p]laintiffs . . . have produced no evidence of such a sinister plot," and we therefore decline to invent one. Id.

2.

None of the cases cited by the plaintiffs support the proposition that this circuit has ever employed a bright-line rule limiting the probative value of minority electoral success, when the minority candidate is elected during the pendency of section 2

28

litigation. This comes as something of a relief to us since we are reluctant to overturn circuit precedent, and because such a rule would be clearly contrary to the Supreme Court's direction that the section 2 "totality of the circumstances" inquiry requires "a searching practical evaluation of the past and present reality," and is dependent upon "the trial court's particular familiarity with the indigenous political reality." Gingles, 478 U.S. at 79, 106 S. Ct. at 2781 (internal quotation marks omitted). In every single case cited by plaintiffs, this court either (1) affirmed the district court's determination, under the deferential clearly erroneous standard, that the timing of an election combined with other circumstances in the case to taint the probative value of a minority candidate's electoral success; or (2) discounted the probative weight assigned to a minority candidate's electoral success on the court's own initiative, for reasons that went beyond the timing of the minority candidate's election.

In Davis v. Chiles, 139 F.3d 1414, 1416 (11th Cir. 1998), cited repeatedly by plaintiffs, this court agreed with the district court "that racially polarized voting plagued the [at-large judicial election districts] at issue," despite the fact that two African-Americans had been elected subsequent to the time that plaintiffs filed suit under section 2. The court found that the district court did not err in discounting the electoral success of one of the candidates because "the Florida legislature specially created a new judgeship . . ., to which the Governor appointed a black lawyer. This

29

single black judge has since won reelection, having run without opposition." Id. at 1417 n.2 (internal citation omitted). The court stated that "[t]his single appointment . . . does not dispel our view that the appointment process has not proven a significant remedy for racially polarized voting." Id. at 1418 n.6. The court also agreed with the district court that the electoral success of a second African-American candidate did not outweigh the ultimate finding of racially polarized voting because "[e]lections of minority candidates during the pendency of Section Two litigation . . . have little probative value." Id. at 1417 n.2. In making this assertion the court did not purport to lay down a hard and fast rule that the timing of a minority candidate's electoral success should always impair the probative value of the election. Instead, the court merely cited Gingles for the proposition that the district "court could properly notice the fact that black electoral success increased markedly . . . after the instant lawsuit had been filed." Id. (citing Gingles, 478 U.S. at 76, 106 S. Ct. at 2779). In other words, the court did exactly what the Supreme Court has directed us to do; the court reviewed the district court's findings regarding the probative value of a minority candidate's election and found that those findings did not evince clear error.

In Stallings, this court found error in the district court's reliance on the electoral success of a minority candidate not because of the timing of the election, but because the election occurred in another jurisdiction. The jurisdiction under scrutiny was the

30

Carroll County Commission in Georgia, to which "no black ha[d] ever been elected." 829 F.2d at 1560 (emphasis omitted). The district court, however, relied upon evidence of "the election of a black to the city council in Carrollton, and the city councils of Villa Rica and Temple, the election of a black as mayor of the city of Whitesburg and the election of a black to the Carrollton School Board." Id. In passing, the court noted that "proof that the election of a minority candidate to political office occurred after initiation of a lawsuit could be a factor mitigating against a finding of increased minority electoral success." Id. (emphasis added). The court's holding that the district court erred, however, was explicitly grounded in its finding that

> [i]n any case, there is no "sustained minority electoral success" approximating the level of representation which the Supreme Court spoke of in Gingles, as evidence of the ability of black voters to elect representatives of their choice in Carroll County. In this case, there has been hardly any minority representation at all. The district court's reliance on municipal elections in Carroll County as proof of minority electoral success of a county electoral scheme is obviously misplaced. The political jurisdiction in question here is the county, not the cities of Villa Rica, Whitesburg, or Carrollton.

Id.

In Marengo County Commission, this court again found error in a district court's finding that minority candidates had enjoyed sustained electoral success in the jurisdiction at issue because in the "73 county-wide elections in which blacks ran

31

against whites" over a period of twelve years, 731 F.2d at 1551-52, only two minority candidates had ever been successful. Id. at 1572. One of them had been appointed and the court found that "[t]he appointment of one black to the School Board, while it may have demonstrated an increased willingness of Marengo County whites to allow black individuals to participate, certainly does not demonstrate the ability of black voters to elect officials." Id. The other had been elected "to the post of County Coroner" (it is unclear when). Id. Although the court noted that minority success "might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election," id. (quoting Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir. 1973)), it clearly based its holding on the paucity of minority electoral success in the jurisdiction:

> These were the only two blacks to take office despite numerous black candidacies. This evidence can be interpreted only as strong evidence of dilution. The district court's conclusion that this nearly complete lack of success did not indicate a lack of effective access to the system is clearly erroneous.

Id.

Finally, in NAACP v. Gadsden County School Board, 691 F.2d 978, 983 (11th Cir. 1982), we found error in a district court's reliance upon the electoral success of a minority candidate who was elected during the pendency of the litigation because

32

(1) even with the candidate's success, only one of the "fourteen blacks [who had] sought county-wide elective office . . . was successful;" and (2) the district court appeared to disregard statistical evidence that both this court and the Supreme Court have ruled is probative of racial vote dilution. While it may be true that a district court should not attach inordinate significance to the election of one minority candidate in the face of overwhelming minority electoral failure, in the instant case only three African-American candidates ever ran for the school board or county commission in Liberty County prior to 1990; and one of them, Earl Jennings, has enjoyed sustained electoral success since that time.

Also, the court in Gadsden County noted that the "district court found that [the one African-American candidate's] election cast into doubt plaintiff's statistical evidence." Id. Plaintiffs used bivariate regression analysis in that case, id. at 983, a form of analysis specifically approved by both this court, see Stallings, 829 F.2d at 1558, and the Supreme Court, see Gingles, 478 U.S. at 52-53, 106 S. Ct. at 2767. Therefore, the court's finding of error in Gadsden County was motivated, in part, by our view that the district court had misapprehended the legal significance of the plaintiffs' statistics.

We do not mean to imply that district courts should now ignore the timing of a minority candidate's election in section 2 cases. As the Supreme Court has stated,

33

"the District Court [can] appropriately take account of the circumstances surrounding recent black electoral success in deciding its significance to [a section 2] claim." Gingles, 478 U.S. at 76, 106 S. Ct. at 2779. We mean only that district courts are not required to discount the success of a minority candidate merely because he or she was elected during the pendency of section 2 litigation. Courts should still approach elections that occur after a section 2 suit has been filed with some caution. But where the plaintiffs bring forth no evidence of electoral manipulation, other than vague speculation about whites scheming to defeat the plaintiffs' lawsuit, a district court is not required to ignore the relevance of obviously probative evidence. Any other rule would subvert the framework established by the Supreme Court in Gingles and De Grandy, which requires courts to undertake a "searching practical evaluation of the past and present reality" with the full totality of the circumstances in view. Gingles, 478 U.S. at 79, 106 S. Ct. at 2781.

B.

We need not tarry long over plaintiffs' argument that the district court clearly erred in finding that the policies underlying the voting procedures applicable to the school board and county commission are not tenuous ("Senate factor" 9). Our consideration of this issue is limited to the policy underlying the voting procedure

applicable to the school board. See Solomon, 957 F. Supp. at 1567 ("Plaintiffs correctly conceded that there was no racial motivation behind the 1900 amendment to the Florida Constitution of 1885, which provided for at-large election of county commissioners."). Plaintiffs quibble with the court's finding that the "adoption of at-large school board elections [in 1953] resulted from a citizen's reform movement in the county to abolish the existing ward-type political system." Id. at 1568. There is some question in the record concerning whether the expert testimony the court relied upon to make this finding was actually in reference to the county commission, rather than the school board. In any event, the mistakes the district court may have made in reviewing the testimony are of no moment. In 1984, Florida passed legislation allowing counties to opt for single-member districts over an at-large system for the election of school board members. See 1984 Fla. Laws ch. 84-113, codified at Fla. Stat. Ann. § 230.105(2) (1998). Subsequently, in 1990, a majority of voters in Liberty County, including 60 percent of African-Americans, voted for at-large elections and against single-member districts for school board elections.[13] As the district court

---

[13] In a subsequently vacated opinion, a panel of this court held that "class opposition to the remedy that may result from the successful litigation of a section 2 claim is irrelevant in weighing the totality of circumstances." Solomon I, 865 F.2d at 1584. This holding was in reference to the fact that many of the plaintiffs had "become equivocal or . . . downright opposed to the maintenance of this lawsuit." Id. The panel's holding had nothing to do with an official referendum conducted by county government that enables all county residents to vote and decide what electoral structure they prefer.

found, "[o]bviously, the fact that black <u>and</u> white voters in Liberty County voted overwhelmingly against single-member districts, tends to undercut any suggestion that the continued policy of maintaining at-large elections is somehow discriminatory or otherwise tenuous." <u>Solomon</u>, 957 F. Supp. at 1568.[14]

---

[14] The district court appears to have limited the relevance of the 1990 referendum to its discussion of whether the policies underlying the electoral procedures applicable to the school board and county commission are tenuous. We note, in passing, that the relevance of such evidence need not be so confined. The fact that a majority of African-Americans who voted in the referendum support the current at-large system of elections also supports the district court's finding that there has not been a lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group ("Senate factor" 8).

A majority of African-Americans in Liberty County obviously believe that an at-large system gives them a greater degree of control over the elected bodies under scrutiny than would a system of single-member districts; if the majority did not so believe, it would not have voted in favor of an at-large system. This belief is grounded in the fact that, under the current system, African-Americans have some control over the electoral success of every member of both the school board and the county commission. Under a single-member district system, they would have control over only one member of each body (because the vast majority of African-Americans would be concentrated into one single-member district).

Because all representatives in Liberty County are, at least in part, dependent for their electoral success on the favorable opinion of the African-American community, representatives would be foolish to ignore the particularized needs of that community. The 1990 referendum supports the conclusion that Liberty County representatives have not been so foolish. It is reasonable to infer that if African-Americans in the county did not believe they were getting their needs met, they would opt for a different system (of single-member districts). The fact that a strong majority voted to retain the at-large system is evidence that representatives on the school board and county commission are keenly aware of the need to consider African-American interests in making political decisions. The inference that the Liberty County power structure has been inclusive of African-American interests is further corroborated by the district court's findings that "[b]lack candidates have been invited to speak at all of the Democratic party political rallies," and "[t]wo blacks . . . are members of the Executive Committee of the Liberty County Democratic Party." <u>Solomon</u>, 957 F. Supp. at 1559.

The 1990 referendum might also weigh in favor of the defendants in any number of other areas, including: whether members of the minority have been denied access to an informal candidate slating process ("Senate factor" 4); whether political campaigns have been characterized by overt or subtle racial appeals ("Senate factor" 6); the extent to which members of the minority group have been elected to public office in the jurisdiction ("Senate factor" 7); and others. Generally, the fact that a majority of African-Americans in Liberty County support the current electoral system

## IV.

Because the district court's understanding of the law was correct and we can discern no clear error in its findings, we AFFIRM the district court's holding that African-Americans have equal access to the political process and an opportunity to elect representatives of their choice to the Liberty County Commission and the Liberty County School Board. Plaintiffs have failed to prove their claims of vote dilution under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

AFFIRMED.

---

indicates that they are satisfied with that system, and therefore signals an absence of subtle or overt forms of racial bias that can interact with electoral structures to hinder minority participation in the electoral process.

As we have made clear, it is adamantly not the job of an appellate court to reweigh evidence with its own view of the facts in mind. And so we do not use the 1990 referendum to support the district court's findings on any factor other than tenuousness. We only note that a district court would not err in considering such evidence as it might bear on other factors, as well.